**BEFORE THE
UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re Blue Spike, LLC <br> Patent Litigation § § § § § § § § § § § | MDL-_____ |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**

**I.   INTRODUCTION**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of the Judicial Panel on Multidistrict Litigation (the "Panel"), Plaintiff Blue Spike, LLC ("Blue Spike," or "Movant") respectfully submits this Memorandum of Law in Support of Motion for Transfer of Actions. Movant moves the Panel for an Order transferring all currently filed patent infringement cases identified in the Schedule of Actions, as well as any cases subsequently filed involving similar facts or claims ("tag along cases") to the District Court for the Eastern District of Texas, Tyler Division.

The Blue Spike Actions entail significant overlap regarding the Blue Spike patents at issue. As a result, the Blue Spike Actions present numerous common issues of fact. Further, centralization will aid in preventing duplicative discovery and inconsistent pretrial rulings as well as promote

1

judicial efficiency. The Eastern District of Texas provides an appropriate venue for consolidation of the Movant's claims. For instance, Judge Robert W. Schroeder presides over ten (10) of the fourteen (14) Blue Spike Actions and has extensive experience in handling complex patent litigation. And the Eastern District of Texas currently offers a less crowded docket than alternative venues in terms of patent litigation, making it an appropriate and efficient choice for centralization.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Blue Spike and Founding Innovator Scott Moskowitz.

Protection of intellectual property is a prime concern for creators and publishers of digitized copies of copyrightable works, such as musical recordings, movies, video games, and computer software. Blue Spike founder Scott Moskowitz pioneered—and continues to invent—technology that makes such protection possible. Moskowitz is a senior member of the Institute of Electrical and Electronics Engineers (IEEE), a member of the Association for Computing Machinery, and the International Society for Optics and Photonics (SPIE). As a senior member of the IEEE, Moskowitz has peer-reviewed numerous conference papers and has submitted his own publications. Moskowitz is an inventor of more than 100 patents, including forensic watermarking, signal abstracts, data security, software watermarks, product license keys, deep packet inspection, license code for authorized software and bandwidth securitization.

The National Security Agency (NSA) even took interest in his work after he filed one of his early patent applications. The NSA made the application classified under a "secrecy order" while it investigated his pioneering innovations and their impact on national security.

As an industry trailblazer, Moskowitz has been a public figure and an active author on technologies related to protecting and identifying software and multimedia content. A 1995 *New York Times* article—titled "TECHNOLOGY: DIGITAL COMMERCE; 2 plans for watermarks, which can bind proof of authorship to electronic works"—recognized Moskowitz's company as one of two leading software start-ups in this newly created field. *Forbes* also interviewed Moskowitz as an expert for "Cops Versus Robbers in Cyberspace," a September 9, 1996 article about the emergence of digital watermarking and rights-management technology. He has also testified before the Library of Congress regarding the Digital Millennium Copyright Act.

Moskowitz has spoken to the RSA Data Security Conference, the International Financial Cryptography Association, Digital Distribution of the Music Industry, and many other organizations about the business opportunities that digital watermarking creates. Moskowitz also authored *So This Is Convergence?*, the first book of its kind about secure digital-content management. This book has been downloaded over a million times online and has sold thousands of copies in Japan, where Shogakukan published it under the name *Denshi Skashi*, literally "electronic watermark." Moskowitz was

asked to author the introduction to *Multimedia Security Technologies for Digital Rights Management*, a 2006 book explaining digital-rights management. Moskowitz authored a paper for the 2002 International Symposium on Information Technology, titled "What is Acceptable Quality in the Application of Digital Watermarking: Trade-offs of Security, Robustness and Quality." He also wrote an invited 2003 article titled "Bandwidth as Currency" for the *IEEE Journal*, among other publications. Moskowitz and Blue Spike continue to invent technologies that protect intellectual property from unintended use or unauthorized copying.

### B. Blue Spike's Patent Infringement Actions.

Movant is the plaintiff in a series of fourteen (14) related actions for patent infringement against twenty (20) defendants (collectively, the "Blue Spike Actions") concerning the same thirty-four (34) U.S. Patents, each of which was invented or co-invented by Blue Spike founder Scott Moskowitz: RE44,222; RE44,307; 5,745,569; 5,889,868; 7,095,874; 7,159,116; 7,287,275; 7,409,073; 7,475,246; 7,647,502; 7,664,264; 7,770,017; 7,779,261; 7,813,506; 7,877,609; 7,913,087; 7,953,981; 7,987,371; 7,991,188; 8,121,343; 8,161,286; 8,171,561; 8,175,330; 8,255,099; 8,265,278; 8,307,213; 8,473,746; 8,538,011; 8,706,570; 8,739,295; 8,903,719; 9,021,602; 9,104,842; and 9,231,980 (collectively, the "Patents-in-Suit"). All of the cases have patents that are in common with at least one other case. In fact, almost all of these patent infringement actions, involve seven (7) patents, separated for convenience into

4

three groups: (1) Blue Spike's ASLR Patents, (2) Blue Spike's Secure Server Patents; and (3) Blue Spike's Trusted Transaction Patents:

**Blue Spike's ASLR Patents:**

1. U.S. Patent No. 5,745,569, titled "Method for Stega-Cipher Protection of Computer Code" (the '569 Patent);

2. U.S. Patent No. 8,930,719, titled "Data Protection Method and Device"(the '719 Patent, and collectively with U.S. Patent No. 5,745,569, the "ASLR Patents");

**Blue Spike's Secure Server Patents:**

3. U.S. Patent No. 7,475,246, titled "Secure Personal Content Server" (the '246 Patent);

4. U.S. Patent No. 8,171,561, titled "Secure Personal Content Server" (the '561 Patent);

5. U.S. Patent No. 8,739,295, titled "Secure Personal Content Server" (the '295 Patent, and collectively with U.S. Patent Nos. 7,475,246 and 8,171,561, the "Secure Server Patents");

**Blue Spike's Trusted Transactions Patents:**

6. U.S. Patent No. 7,159,116, titled "Systems, Methods and Devices for Trusted Transactions" (the '116 Patent); and

U.S. Patent No. 8,538,011, titled "Systems, Methods and Devices for Trusted Transactions" (the '011 Patent, and collectively with U.S. Patent No. 7,159,116, the "Trusted Transactions Patents").

All of the Blue Spike Actions involve the same central issue of whether the defendants make, use, offer for sale and/or import into the U.S. products, systems, and/or services that infringe patent claims owned by Blue Spike. Accordingly, these cases will benefit from consolidation of pretrial proceedings.

**II.   ARGUMENT**

   **A.   The Legal Standard.**

Pursuant to 28 U.S.C. § 1407, "when civil actions involving one or more common questions of fact are pending in different districts," the Judicial Panel on Multidistrict Litigation may transfer the actions "to any district court for coordinated or consolidated pretrial proceedings" if the Panel determines a transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of [the] actions." To determine whether centralization is appropriate, the Panel "analyzes each group of cases in light of the statutory criteria and the primary purposes of the MDL process." *In re: Phenylpropanolamine (PPA) Products Liability Litigation*, 460 F.3d 1217, 1230 (9th Cir. 2006). In terms of patent litigation, Congress acknowledges patent cases as specifically appropriate for centralization, given the potential for "massive filings of multidistrict litigation." H.R. Rep. No. 90-1130, at 3, reprinted in 1968 U.S.C.C.A.N. 1898, 1900.

Given the propensity for patent cases to involve shared "factual questions concerning . . . technology underlying the patents, prior art, claim construction and/or issues of infringement involving the patents," the Panel has previously found centralization necessary to "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." *In re Rembrandt Techs., L.P.*, 493 F. Supp. 2d 1367, 1368 (J.P.M.L. 2007). Transfer under § 1407, however, does not require complete identity or even majority of common factual or legal issues as a prerequisite to transfer. *Id.* at 1369.

### B. The Blue Spike Actions Should Be Consolidated.

#### 1. The Blue Spike Actions Present Common Questions of Fact.

These fourteen Blue Spike actions present numerous common questions of fact regarding patent infringement. The majority of the actions address infringement claims regarding the same seven (7) patents (the "ASLR Patents", the "Secure Server Patents" and the "Trusted Transactions Patents." The Panel has recognized that actions involving the same or overlapping patents are particularly appropriate for consolidation because they inherently present many common questions of fact. For example, in *In re Acacia Media Techs. Corp. Patent Litig.*, the Panel recognized that when overlapping patents are asserted in multiple actions, "[a]ll actions … can be expected to share factual and legal questions concerning such matters as the technology underlying the patents, prior art, claim construction and/or issues of

7

infringement involving the patents." 360 F. Supp. 2d 1362, 1364 (J.P.M.L. 2005) (consolidating five actions asserting overlapping patents with a related unfair competition action); *see also In re MLR, LLC Patent Litig.*, 269 F. Supp. 2d 1380 (J.P.M.L. 2003) (ordering consolidation of three actions dealing with cellular phone and/or modem products, on the basis that overlapping complex patents, "can thus be expected to share factual and legal questions concerning such matters as patent validity, prior art, obviousness and interpretation of various claims of the patents.")

### 2. Coordination Serves the Best Economic and Equitable Interests of the Parties, Counsel, and Judiciary.

Coordination of these actions serves the best interests of the parties, parties' counsel, and the judiciary by conserving economic resources and equitably preventing inconsistent rulings. Centralization will allow the parties and courts to avoid spending a great deal of time, effort, and money litigating common issues of both fact and law. Furthermore, the parties will be prejudiced by various courts entering contradictory rulings on claim construction of disputed patent claim terms, and on discovery and evidentiary issues common to all cases. Such inconsistency will likely lead to more litigation and incongruous results. In contrast, coordination avoids the pitfalls of piecemeal litigation by resolving disputes related to common issues in a centralized setting. *In re StarLink Corn Products Liability Lit.,* 152 F.Supp.2d 1378, 1380 (J.P.M.L. 2001).

The importance of consistency in pretrial rulings is further heightened in patent litigation where courts must contend with complex technological issues. In decisions ordering MDL transfer, the Panel has repeatedly emphasized the need

to obtain consistency in pretrial rulings, "especially with respect to time-consuming and complex matters of claim construction." *In re Desloratadine Patent Litig.*, 502 F. Supp. 2d 1354, 1355 (J.P.M.L 2007); *see also Innovatio*, 2011 WL 6890252, at *1 ("Centralization will . . . prevent inconsistent pretrial rulings (particularly on claim construction issues) . . . ."). In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996), the Supreme Court further highlights the importance of "interjurisdictional uniformity" in claim construction determinations.

Here, the Eastern District of Texas has already grappled with the technological complexities of the Blue Spike actions during the course of conducting *Markman* hearings for three (3) for these patents, and earlier this year issued claim construction orders for two of the current actions in Schedule A (*Blue Spike, LLC v. Toshiba America, Inc. et al.*, 6:16-cv-430-JDL (E.D. Tex.) and *Blue Spike, LLC v. Verimatrix*, 6:17-cv-329-RWS (E.D. Tex.)). Centralization will aid in avoiding inconsistent rulings regarding these orders as well as serve the interest of judicial economy, avoiding duplicating the efforts already done to bring the technological issues of the Blue Spike actions into focus.

    **3.    The Complexity of the Blue Spike Litigation Necessitates Centralization**.

The obstacles of addressing the complexity of the technical issues at stake in patent litigation are only exacerbated when a large number of actions and defendants are involved. The Panel has routinely examined the sheer number of

9

actions, defendants, and courts involved in deciding whether centralization is appropriate. *See, e.g., In re Parallel Networks, LLC, ('111) Patent Litig.*, 867 F.Supp.2d 1352, 1353 (noting that voluntary cooperative efforts to mitigate discovery difficulties would be insufficient given that there were thirty (30) defendants involved in the litigation); *In re Toyota Motor Corp. Prius HID Headlamp Prods. Liability Litig.*, 754 F. Supp. 2d 1380, 1381 (J.P.M.L. 2010) (refusing centralization in part because there were "only three actions" pending); *In re UPS Supply Chain Solutions, Inc., FLSA Litig.*, 729 F. Supp. 2d 1356 (J.P.M.L. 2010 (same, "only two actions" in two district courts). However, the Panel has found that a large number of district courts involved is not necessary to render cooperative discovery efforts impracticable when a large number of defendants are involved. *See In re Parallel Networks*, 867 F.Supp.2d at 1353 (noting that only having two (2) actions and two (2) district courts involved did not outweigh the difficulties of having thirty (30) defendants involved).

Similarly, while only two district courts are involved in the case at hand, the Blue Spike actions collectively engage twenty (20) defendants. Moreover, as opposed to only two (2) actions being involved in *In re Parallel Networks,* Movant's motion seeks the transfer of twelve (12) separate actions. The Blue Spike actions then presents an overall procedural complexity at least commensurate with that which the Panel found sufficient to necessitate transfer in *In re Parallel Networks* from District of Delaware to the Eastern District of Texas.

### C. The Cases Should Be Consolidated for Pre-Trial Purposes in the Eastern District of Texas.

The MANUAL FOR COMPLEX LITIGATION (FOURTH) §20.131 (2010) offers multiple factors for the Panel to consider when deciding if a District is appropriate for centralization, including ". . . where discovery has occurred, where cases have progressed furthest, . . . where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges." The Eastern District of Texas is already home to twelve (12) of the fourteen (14) Blue Spike actions, including the two actions in which claim construction orders have already been ordered (*Toshiba* and *Verimatrix*). This Court will be thoroughly familiar with the particular legal and factual issues involving Blue Spike's technology as the result of adjudicating other suits involving Blue Spike's patents.

Further, Hon. Robert W. Schroeder presides over ten (10) of the fourteen (14) Blue Spike actions, including *Verimatrix*. By virtue of his experience with the majority of the actions as well as the claim construction proceedings in *Verimatrix*, Judge Schroeder has already extensively engaged the technological complexities underpinning the Blue Spike actions. Utilizing his already considerable experience with these actions will undoubtedly serve the interest of judicial economy.

Further, Judge Schroeder has extensive experience with patent litigation by virtue of being a judge in a District that has historically seen a heavy volume of patent cases. In 2016, the Eastern District of Texas had 1,647

11

patent cases filed there, more than any other District.[1] With this experience, Judge Schroeder has the necessary expertise to streamline the pretrial process.

Despite the high number of patent cases filed in the Eastern District of Texas last year, its docket is quickly diminishing in the wake of *TC Heartland*. In the thirty-eight (38) days leading up to the decision, one hundred and sixty-one (161) patent suits were filed in the Eastern District of Texas.[2] However, in the thirty-eight (38) days *following* the decision, only sixty-one (61) patent cases were filed there. During the same time period, the number of suits filed in Delaware grew from fifty-two (52) in the period before *TC Heartland* to one hundred and seventeen (117) in the period after. Overall, the total number of suits filed across the country did not show a significant change between the two time-periods. This signals the beginning of a trend in which the Eastern District of Texas will have an increasingly greater capacity to handle MDL cases, in contrast to the District of Delaware. Further, although Judge Schroeder and the other judges in the Eastern District of Texas have prior experience with MDLs there is currently no pending MDL litigation in the Eastern District of Texas, so there is no potential issue with overloading the district with multiple MDL transfers at once.[3] The Court even has technology

---

[1] LexMachina, 2016 Fourth Quarter Litigation Update, https://lexmachina.com/q4-litigation-update/ (last visited July 10, 2017).
[2] Ryan Davis, *TC Heartland Is Already Remaking the Patent Litigation Map*, Law360, https://www.law360.com/articles/940341 (last visited July 10, 2017).
[3] United States District Court: Eastern District of Texas, MDL Cases, http://www.txed.uscourts.gov/?q=mdl-cases (last visited July 10, 2017).

infrastructure for MDLs as shown by its public website with links to all current and former MDL litigation. *See* *http://www.txed.uscourts.gov/?q=eastern-district-judges* as visited on July 10, 2017.

Accordingly, transfer to the Eastern District of Texas is appropriate.

### D.     Conclusion

For the foregoing reasons, Movant respectfully requests that the Panel centralize the Blue Spike actions for coordinated or consolidated pretrial proceedings in the Eastern District of Texas before Judge Schroeder.

Dated:  July 11, 2017

Respectfully submitted,

  /s/ Randall T. Garteiser
Randall T. Garteiser
  Lead Attorney
  California Bar No. 231821
  Texas Bar No. 24038912
  rgarteiser@ghiplaw.com
Christopher A. Honea
  California Bar No. 232473
  Texas Bar No. 24059967
  chonea@ghiplaw.com
Kirk J. Anderson
  California Bar No. 289043
  kanderson@ghiplaw.com

13

GARTEISER HONEA, P.C.
119 W Ferguson St.
Tyler, Texas 75702
(888) 908-4400 tel/fax

*Counsel for Blue Spike, LLC*

## Certificate of Service

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on this date stamped above.

    /s/ Randall Garteiser